*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

February 27, 2019

**BY ECF**

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Keith Wellner</u>, 16 Cr. 746 (PKC)

Dear Judge Castel:

    The Government respectfully submits this letter in connection with the sentencing of the defendant, Keith Wellner, which is scheduled for May 1, 2019. As set forth herein, Wellner provided critical and substantial assistance to the Government in its prosecution of David Bergstein. Accordingly, Government intends to request at sentencing, pursuant to Section 5K1.1 of the Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Wellner in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

## Preliminary Statement

    On December 18, 2017, Wellner pleaded guilty to Indictment 16 Cr. 746 (PKC) (the "Indictment"), which charged him with: conspiracy to commit investment adviser fraud and securities fraud, in violation of Title 18, United States Code, Section 371 (Count One); investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 (Counts Two and Three); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Counts Four and Five); and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Six).

    Wellner entered his guilty plea pursuant to a cooperation agreement with the Government. Under that agreement, if Wellner provides substantial assistance in the investigation and prosecution of others, and otherwise complies with the obligations imposed by the agreement, the Government will request that the Court sentence him in light of the factors set forth in Section 5K1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines").

    The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the substantial assistance that Wellner has rendered in the investigation and prosecution of others.

**Facts**

As proven at the trial of David Bergstein, Keith Wellner, the former General Counsel, Chief Compliance Officer, and Chief Operating Officer of Weston Capital Asset Management ("Weston"), an investment adviser registered with the Securities and Exchange Commission, participated with David Bergstein and Albert Hallac, Weston's president, in a conspiracy to cause Weston to enter into hidden, conflicted transactions that ultimately resulted in significant losses to Weston investors.

A. Background

Weston provided discretionary investment management and advisory services to domestic and foreign private investment funds, as well as domestic and foreign institutions and high net-worth individuals, and managed more than a dozen hedge funds for its investors. Three of the funds that Weston managed were the Wimbledon Financing Fund ("WFF"), the Wimbledon Class TT Portfolio ("TT"), and the Partners 2 Fund ("P2"). At all relevant times, Hallac, who founded Weston, was Weston's president and acted as an investment adviser to WFF, TT, and P2 and their investors.

From in or about 2007 through in or about July 2012, Wellner served as Weston's General Counsel, Chief Operating Officer, and Chief Compliance Officer. From in or about 2009 through in or about July 2012, Wellner also managed the investments of WFF. At various times, Wellner served as an investment advisor to WFF investors, and thus was obligated to act in the best interests of those investors and to disclose to them all material facts.

From in or about 2011 through 2012, Hallac, Wellner, and Bergstein engaged in a scheme to defraud WFF, P2, and TT and their investors by, among other things, (i) concealing material information from Weston investors about financial transactions involving their money; (ii) transferring funds from one pool of investors to make payments to, provide a security interest for, or otherwise benefit, another pool of investors, without the required disclosures to investors concerning conflicts of interest; and (iii) misappropriating a portion of funds transferred from investor accounts for their own and others' benefit.

Hallac, Wellner, and Bergstein orchestrated this scheme through two transactions involving Weston investors' assets: first, a loan from P2 purportedly to a Bergstein-controlled entity called Arius Libra, and, second, a loan from TT purportedly to a second Bergstein-controlled entity called Swartz IP Services ("Swartz IP").

B. The P2 Loan Scheme

In or about 2010, Hallac agreed on behalf of Weston to a transaction with an entity named Gerova Financial Corporation ("Gerova"), an international reinsurance company, in which Weston sent assets from WFF to Gerova in exchange for restricted shares of Gerova stock. This exchange was intended to replace illiquid hedge fund assets with stock, which could be bought and sold more easily. In 2011, however, Gerova's stock price plummeted.

2

In or about early 2011, Bergstein met with Hallac to propose a transaction purportedly to "unwind" WFF's interests in Gerova. Bergstein subsequently formulated the outlines of a structure in which Weston would return its Gerova stock, receive the WFF assets back from Gerova, and place those assets into another entity known as Arius Libra as part of an investment in a purported medical billing business. Bergstein falsely represented to Hallac and Wellner that certain payments would be made along the way to facilitate the transfers.

To complete this transaction, Bergstein, Hallac, and Wellner agreed to loan money from the P2 Fund, another Fund operated and managed by Weston, to Arius Libra, a shell company controlled by Bergstein that was purportedly involved in the medical billing business. The purpose of this loan (the "P2 Loan") was purportedly (1) to pay certain debts associated with Gerova, including debts purportedly owed to Bergstein; and (2) to fund Arius Libra's purported medical billing businesses. Hallac and Wellner arranged for the P2 Loan to be secured by certain WFF hedge fund assets. Thus, in the event the P2 Loan was not repaid, the P2 Fund had the ability to liquidate WFF assets to make P2 investors whole, to the detriment of investors in WFF. In total, approximately $9 million in investor money was disbursed at Bergstein's request from the P2 Fund pursuant to the P2 Loan.

As Hallac, Wellner, and Bergstein well knew, P2 investors were never informed of the existence of the P2 Loan, given any information about Arius Libra, or told about the conflict of interest arising from the P2's interest in WFF assets. And although Bergstein had represented to Weston that disbursements made pursuant to the P2 Loan would be used both to pay off Gerova creditors and to fund Arius Libra's medical billing businesses, in fact, Bergstein, unbeknownst to Hallac and Wellner, misappropriated the vast majority of the P2 Loan proceeds and used them to pay for, among other things, his own personal expenses, including credit card bills, personal legal bills, and other personal items. As Wellner testified at trial, none of the P2 Loan proceeds were used for purposes consistent with those stated in the P2 offering memorandum. Bergstein also secretly transferred P2 loan proceeds to a number of his associates.

C. The TT Loan

In late 2011, after Bergstein had dissipated the P2 Loan proceeds, Bergstein, Wellner, and Hallac secretly arranged for TT to loan investor proceeds to Swartz IP, another entity controlled by Bergstein (the "TT Loan"). As part of TT Loan, Hallac transferred approximately $17.7 million from TT to Swartz IP, an entity that Bergstein falsely represented was capitalized by more than $19 million and backed by Jerry Swartz, a wealthy investor and inventor. Unbeknownst to Hallac and Wellner, Swartz IP was merely a shell entity that was controlled by Bergstein and had no assets whatsoever, and Jerry Swartz had nothing to do with Swartz IP. Bergstein also falsely represented to Hallac and Wellner that he would provide certain investment returns and meet redemption requests for TT through Swartz IP using funds Swartz IP purportedly had.

Hallac, Wellner, and Bergstein hid the TT Loan from investors. Of the money that was transferred to Swartz IP, moreover, Hallac, Wellner, and Bergstein directed that approximately $3 million be transferred to P2 in Ponzi-like fashion to pay back part of the P2 Loan. Bergstein, Wellner, and Hallac thus directed that money from one set of Weston's investors—TT investors—

3

be used to pay back part of a debt owed to another set of Weston's investors—P2 investors—another conflict of interest that was not disclosed.

In addition to using investor proceeds for unauthorized and improper purposes, Bergstein arranged for Hallac to receive $750,000 in TT Loan proceeds through a shell entity controlled by Hallac called Purplebox LLC, which Hallac subsequently divided up among himself, his son, and Wellner (who received $125,000). As a further part of the scheme, Bergstein made false representations about Swartz IP's assets and ability to meet redemption requests and secretly diverted the vast majority of the TT Loan proceeds to pay for millions of dollars his own personal expenses, including personal credit card bills, private jets, and expensive artwork. Although Swartz IP paid a redemption request of approximately $1 million to a particular TT Portfolio investor, Bergstein and Swartz IP did not repay to the TT Portfolio the funds that had been entrusted to Swartz IP. None of the TT Loan proceeds were used for purposes consistent with those stated in the TT offering memorandum. The total loss to TT investors was at least approximately $16.7 million. With Wellner's knowledge, Bergstein also created fake documents, including a fake loan note purportedly between Swartz IP and Arius Libra, they used to conceal the scheme from investors. Wellner also agreed with Bergstein to make a fraudulent disclosure to investors on an Internet "dropbox" that Swartz IP was the lender to Arius Libra. Together, Bergstein and Wellner repeated that lie in meetings with investors.

    D.  The Fake P3 Loan Note

In or about mid-2012, at the same time that Bergstein was diverting and misappropriating TT funds, Bergstein took steps to purchase a public company known as Bidz.com ("Bidz"). As a part of the Bidz transaction, Bergstein convinced Hallac to use a Weston fund known as the Partners Master Fund III Ltd. (the "P3 Fund") to provide Bidz with a guarantee and equity commitment in the event that an entity that Bergstein controlled could not raise enough money to buy out Bidz's existing shareholders. In reality, the P3 Fund was not capitalized, as both Hallac and Bergstein knew. At Bergstein's direction, Hallac provided to Bidz's outside counsel a purported balance sheet for the P3 Fund reflecting tens of millions of dollars in fabricated assets. Bergstein drafted the fake balance sheet and emailed it to Hallac so that it could be provided to counsel for Bidz.

When Wellner learned of Bergstein's plan, Wellner blew the whistle. Wellner called Weston's outside counsel and advised counsel that the P3 Fund did not exist and the purported balance sheet was fictitious. Weston's outside counsel then raised the issue with Hallac, threatening to inform Bidz. Hallac immediately told Bergstein, who directed Hallac to fire Weston's outside counsel. Hallac did so minutes later in an email.

    E.  Criminal Charges

As a result of the conduct described above, Hallac pled guilty to Information 15 Cr. 512 (PKC), and Bergstein and Wellner were charged in Indictment 16 Cr. 746 (PKC) (the "Indictment") in November 2016. In December 2017, Wellner pled guilty to the Indictment pursuant to a cooperation agreement with the Government. After a trial at which both Wellner and Hallac testified, Bergstein was convicted on all counts. Bergstein was sentenced principally to 96

4

months' imprisonment.  In January 2019, Hallac, a cooperating witness, was sentenced principally to time served, with 90 days' home confinement.

## Cooperation and Significance of Assistance

Wellner provided substantial assistance in the investigation of the Weston scheme described above and in the prosecution and trial of Bergstein.  Wellner began meeting with the Government before his indictment and guilty plea.  Over the course of numerous, sometimes lengthy, proffers, Wellner provided critical and corroborated information about the Weston fraud, his own involvement in the scheme, and the roles played by Bergstein and Hallac.  Wellner's assistance was critical in the Government's ability to convict Bergstein at trial.

After his guilty plea in December 2017, Wellner met with the Government on numerous occasions to continue to assist with the investigation and prepare for trial against Bergstein in February 2018.  During trial, Wellner testified for approximately a full week, was subject to extensive cross-examination, and, in the Government's view, testified truthfully.

During the Bergstein trial, Wellner was arguably the Government's most important witness.  As the Court is aware, the transactions underlying the charges in this case are complex, involving multiple entities, numerous bank accounts, and complex financial terms.   For this reason, it was crucial to have a witness who was not only an insider but could distill the complexities of the scheme and make them understandable to a lay jury.  Wellner was such a witness.  In this regard, he provided critical background and contextual testimony relating to the Weston scheme and explained the highly complex scheme in a manner that was accessible to the jury.  For example, Wellner testified about the role of an investment advisor, background for the P2 and TT Loan, the mechanics of those transactions, and the undisclosed conflicts of interest resulting from the loans.

Most importantly, as a participant in the criminal conspiracy with Bergstein, Wellner provided important testimony about his discussions with Bergstein about entering into the P2 and TT Loans.  Specifically, Wellner testified that he, Hallac, and Bergstein explicitly discussed that (1) the P2 and TT Loans were impermissible under the terms of those funds' offering memoranda, which specified that TT funds could be invested only in hedge fund managers (in the case of P2) and a liquid fund known as Tewksbury (in the case of TT); (2) the P2 and TT Loans would not be disclosed to investors because investors would be upset about the loans; (3) the funds that were used to issue the P2 and TT Loans came from the liquidation of a position in other securities investments, (4) the P2 and TT Loans involved secretly using one pool of investor assets for the benefit of another pool of investor assets, thus creating a conflict of interest.  Hallac substantially corroborated Wellner's account.  This testimony was important in rebutting Bergstein's purported good faith defense and claim that he was unaware of Hallac's breaches of his fiduciary duty.

Wellner also provided significant contextual testimony that the purpose of the P2 and TT Loan articulated by Bergstein—to further the purported medical billing business—was itself an improper use of P2 and TT proceeds, as reflected in those funds offering memoranda.  Wellner further explained how he and Bergstein lied to and misled investors by creating fake documents, such as the fake P2 Loan note.

In sum, as a central witness, Wellner provided critical, corroborated testimony about the central facets of the Weston scheme. With regard to relative culpability, the Government views Wellner as less culpable than both Bergstein and Hallac.

### Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. See U.S.S.G. § 5K1.1(a). The application of each of those factors to Wellner's cooperation is set forth below.

Significance and usefulness of the defendant's assistance (§ 5K1.1(a)(1))

Wellner's cooperation has been substantial. He has provided credible, important, and corroborated information about the Weston scheme, including insight into his dealings with Bergstein and their decision to enter into secret loans in conflict with Hallac's fiduciary duty. Wellner provided corroborating details that helped fully explain the complex scheme to the jury in a comprehensible way. The Government's first witness, Wellner was arguably the most important witness called at trial because he outlined the scheme for the jury and described some of Bergstein's most significant criminal conduct, including Bergstein's lies to investors, creation of fake documents, and false statements in connection with Bergstein's bankruptcy proceeding.

Truthfulness, completeness, and reliability of any information or testimony (§ 5K1.1(a)(2))

In the Government's view, Wellner was fully forthcoming about his own misconduct and the misconduct of others. As noted, Wellner's information was substantially corroborated by other evidence, including the testimony of Hallac and extensive documentary evidence.

Nature and extent of the defendant's assistance (§ 5K1.1(a)(3))

Wellner proffered with the Government on several occasions, beginning before he was charged. He then met extensively with the Government after the Indictment was returned and in preparation for his trial testimony. At Bergstein's trial, Wellner was called as the Government's first witness. He laid out the scheme from its inception to completion in detail for the jury, and his testimony spanned a full week. Wellner was subject to extensive cross-examination, which lasted approximately four days. Notwithstanding the length of cross-examination, the defense did not impugn Wellner's credibility. The Government believes the jury likely credited Wellner's testimony in returning a guilty verdict.

Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance (§ 5K1.1(a)(4))

The Government is not aware of any physical danger Wellner or his family has faced as a result of his cooperation to date.

Timeliness of the defendant's assistance (§ 5K1.1(a)(5))

Wellner's assistance was timely. He began proffering with the Government in or about the summer of 2015, more than a year before he was charged. Shortly after the return of the Indictment, Wellner expressed interest in continuing to proffer and cooperate with the Government in preparation for Bergstein's trial. The information he provided was critical to the Government's ability to convict Bergstein.

### **Conclusion**

In light of the facts set forth above, and assuming Wellner continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing, pursuant to Section 5K1.1 of the Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Wellner in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/ Edward Imperatore
      Edward Imperatore
      Elisha Kobre
      Assistant United States Attorneys
      Southern District of New York

cc: Gordon Mehler, Esq. (by ECF)